# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>RAUL ROSALES,<br><br>                    Defendant. | 2:23-cr-00044-GMN-VCF<br><br>Report and recommendation to deny defendant's motions to suppress or dismiss indictment [ECF Nos. 55 and 57]<br><br>and<br><br>Order granting motion for leave to file excess pages and vacating the evidentiary hearing [ECF Nos. 72 and 79] |

Defendant Raul Rosales-Villegas filed (1) a motion to suppress and a request for a *Franks* hearing and (2) a motion to dismiss. ECF Nos. 55 and 57. I recommend that the defendant's motions be denied. The government filed a motion for leave to file excess pages, which I grant. ECF No. 72. Since I decide this matter on the briefing, I vacate the evidentiary hearing. ECF No. 79.

## I.    Background

Las Vegas Metropolitan Police Department Officer A. Schroeder received a license plate reader notification that a suspect vehicle from a Los Angeles shooting was at the intersection of Sands and Koval. See Officer Schroeder's declaration of arrest report at ECF No. 55-4. The arrest report explains that "[t]he NCIC hit stated, the above vehicle was involved in a drive by shooting, which occurred inside of the Los Angeles County Sheriff's Department jurisdiction." *Id.* The hit also stated that "the subjects are supposed to be armed." ECF No. 55-5. According to another report, based on the license plate reader notification, Officer J. Perez and Officer J. Luoto were dispatched to attempt and locate the felony vehicle. See Officer Perez's declaration of arrest report. ECF No. 55-6.

After locating the vehicle at the Wynn valet entrance, Officer Perez and Officer Luoto announced that they would wait for another police officer to arrive before approaching the felony vehicle. See ECF No. 55-7, Officer Luoto's body cam, at 04:20 – 04:40. Officer Hanson arrived, and Officer Perez, Officer Luoto, and Officer Hanson positioned themselves to conduct the stop. *Id.* at 04:45 – 05:25; ECF No. 55-8, Officer Perez's body cam, at 05:00 – 07:05; ECF No. 55-9, Officer Hanson's body cam, at 03:25 – 03:55. Officer Luoto called out to dispatch the license plate number to confirm the car he observed in the Wynn Casino and Hotel valet was the correct car and license plate. ECF No. 55-5, at 3:27. Dispatch confirmed the number and informed the officers: "…It looks like it's a felony vehicle out of LA. Assault with a deadly weapon. It looks like the firearm involved is a 9 mm, semi auto." *Id.* at 01:04 to 10:10.

The officers drew their guns as Officer Luoto, using a megaphone, commanded the driver and sole occupant of the vehicle, later identified as Rosales-Villegas, to (1) throw out the keys and show his hands; (2) roll down all the windows; (3) open his door; (4) come out of the car with his hands up; and (5) walk backwards towards the officers. ECF No. 55-7 at 5:16 to 7:03. Officer Luoto handcuffed him, conducted a pat-down, and asked him if he had any weapons. *Id.* at 7:11 and 7:49. Officer Hanson and Officer Perez conducted a protective sweep of Rosales-Villegas's vehicle. ECF No. 55-8, at 07:10 – 07:45. Immediately after Officer Hansen conducted protective sweep—approximately one minute and thirty seconds after Rosales-Villegas exited his car—he told Officer Luoto of what he saw during that sweep: "There are a shit ton of rounds in the back seat." ECF No. 55-7 at 9:48 and ECF No. 55-6 at 8:15. Officer Hansen specifically stated: "9mm rounds." *Id.* Officer Hansen recorded the same finding through the audio dispatch: "There are numerous . . . it appears . . . 9 mm in the back seat" and "the windows are down and there are numerous rounds on that floor." ECF No. 55-5 at 04:54 to 5:50. Officer Hanson got on a radio call and informed an unknown sergeant that the vehicle "hit on that felony assault

1  with deadly weapon out of Cali…the other [officers] are working on [Rosales-Villegas] right now to ID

2  him." ECF No. 55-9, at 08:00 – 08:20. at 09:25 – 12:15.

3      Officer Perez asked for Rosales-Villegas's ID. ECF No. 55-8, at 08:04 – 09:03. Rosales-Villegas

4  explained that he did not have his ID on him, but he did have a picture of his ID on his phone. *Id.*

5  Officer Perez wrote down the name and date of birth Rosales-Villegas provided: Felipe Rodriguez,

6  08/01/1979. *Id.* at 09:03 – 09:45. Officer Perez asked if police could search the glove compartment of

7  his car, and Rosales-Villegas said "no." *Id.* at 08:04 – 09:03. Officer Hanson advised Officer Luoto that

8  they needed to "contact the detective out of Cali, figure out what we got, what [the detective] wants

9  done with the vehicle, and some of the back story." Hanson continued, "once we get that back story, find

10  out [Rosales-Villegas'] priors, so when we run him, find out his priors…then we have the whole story at

11  that point." ECF No. 55-7 at 12:15 – 14:45.

12      Rosales-Villegas was put into the back of Officer Perez's patrol vehicle, still handcuffed. ECF

13  No. 55-10. Body cam, at 10:08 – 11:25. Officer Perez expressed that he had difficulty locating the name

14  Felipe David Rodriguez. ECF No. 55-8, at 14:25 – 14:40. Officer Perez asked Rosales-Villegas multiple

15  questions: asking him for his name, date of birth, social security number, whether he'd been arrested

16  before, where he is from, and who owned the vehicle. ECF No. 55-8, at 14:30-18:40. Rosales-Villegas

17  offered the same personal identifying information. Officer Perez advised him, "If I can't identify you,

18  I'm going to have to take you down there and get you fingerprinted." *Id.* at 17:58-18:05. According to

19  the police report, either while they were in route to the station or at the police station, the officers

20  learned of Rosales-Villegas's true identity and that he was a convicted felon (and thus a prohibited

21  person from possessing firearms). ECF No. 55-6. After learning of Rosales-Villegas' identity, officers at

22  the scene of the arrest applied for and received a search warrant to search the vehicle and obtain DNA

23  from Rosales-Villegas. ECF No. 55-12, search warrant; and ECF No. 55-4. The search yielded a 9mm

24  pistol and multiple rounds of 9mm ammunition. ECF No. 55-4.

25

A grand jury returned an indictment charging defendant Raul Rosales-Villegas with deported alien found in the United States (count one), in violation of 18 U.S.C. §§ 922(g)(5).  ECF No. 21. A grand jury later returned a superseding indictment charging defendant Rosales-Villegas with two additional counts: illegally or unlawfully present alien in possession of a firearm (count two) and felon in possession of a firearm (count three), both in violation of 18 U.S.C. §§ 922(g)(1) and 922(g)(5)(A). ECF No. 46.

## II.    Discussion

Rosales-Villegas moves to suppress the evidence recovered from the car and the DNA sample taken from him. Rosales-Villegas argues that the LVMPD should not have known he was in Las Vegas because automated license plate readers are a search under the Fourth Amendment that require a warrant. ECF No. 55. Defendant also argues that the LVMPD officers should not have handcuffed him and placed him in the back of a patrol car because the officers lacked probable cause. *Id.* The defendant also argues that providing a false identity to the officers is not illegal. *Id.* Defendant also requests a Franks hearing because he argues that the LVMPD detective who obtained a search warrant did not notify the issuing judge of facts known by the officers in California. *Id.*  Rosales-Villegas argues in his motion to dismiss that *Bruen* renders 18 U.S.C. §§ 922(g)(1) and(g)(5)(A) unconstitutional. ECF No. 57, see 142 S. Ct. at 2126.

### a.   Defendant's Motion to Suppress

#### i.   Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The general rule is that the Fourth Amendment makes warrantless searches and seizures unreasonable as a matter of

law. See *United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012)(citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). Traffic stops provide one of the "few specifically established and well-delineated exceptions" to this rule. *Id.*

A police officer may stop a car without a warrant, and thereby seize its passengers, if there is reasonable suspicion that criminal activity may be afoot or that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (stating that a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver). Reasonable suspicion is a low standard; it only requires a police officer to "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a stop. See *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The police may conduct "a brief, investigatory search or seizure, so long as they have a reasonable articulable suspicion that justifies their actions." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 889 (9th Cir. 2002). Officers may also use reasonable force to effect an investigatory detention where officer safety is at issue. *Allen v. city of Los Angeles*, 66 F.3d 1052, 1056-7 (9th Cir. 1995) see also United States v. Jacobs, 715 F.2d 1343, 1345-46 (9th Cir. 1983) ("the use of force in making a stop will not convert the stop into an arrest 'if it occurs under circumstances justifying fears for personal safety'") (quoting *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979)).

While intrusive measures may convert a stop into an arrest if the measures would cause a reasonable person to feel that he or she will not be free to leave after brief questioning--i.e., that indefinite custodial detention is inevitable. *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (quoting *Kraus v. Pierce County*, 793 F.2d 1105, 1109 (9th Cir. 1986). See *United States v. Miles*,

247 F.3d 1009, 1012 (9th Cir. 2001) ("There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." (emphasis added) (quoting *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990)). Of course, the "reasonable person" test presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).

"The purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence," *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983) (internal quotation marks and citation omitted), "we allow intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Miles*, 247 F.3d at 1012-13 (quoting *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996)); see also *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable" in the course of a *Terry* stop). As a result, officers with a particularized basis to believe that a situation may pose safety risks may handcuff or point a gun at an individual without converting an investigative detention into an arrest. See *Miles*, 247 F.3d at 1013; *Alexander*, 64 F.3d at 1320 (holding that officers could order individuals from a car at gunpoint and handcuff them during a *Terry* stop).

A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979). In the context of a Terry traffic stop, an officer need only have reasonable suspicion to justify the seizure. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir.2000). While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop…he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015).

Like a *Terry stop*, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns. *Rodriguez*, 135 S. Ct. at 1614. As *Rodriguez* stated, "[t]he government's interest in officer safety "stems from the mission of the stop itself" because [t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely."

During a *Terry* stop, law enforcement officers may conduct a proactive search of a vehicle's interior, whether or not the occupants have been removed from the vehicle, because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile and he will then have access to any weapons inside." *Michigan v. Long*, 463 U.S. 1032, 1052 (1983). "[S]uspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048. *Long* held that "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable believe based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049-50 (quoting *Terry v. Ohio*, 392 U.S. at 21) (1968).

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.3d at 1072 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Facts are viewed in accordance with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (cited in *United States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007). "The Ninth Circuit has defined probable cause as follows: when 'under the totality of circumstances

known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *Lopez*, 482 F.3d at 1072 (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). Conclusive evidence of guilt is not necessary to establish probable cause. *Id.* "Generally, 'an officer need not have probable cause for every element of the offense.'" Lopez, 482 F.3d at 1072 (citing *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994)). Probable cause is an objective standard. *Id.*

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a hearing is warranted where the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56. "Misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). The defendant must overcome "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. To be entitled to a Franks hearing: (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause. United States v. DiCesare, 765 F.2d 890-95, amended, 777 F.2d 543 (9th Cir. 1985).

A defendant may also challenge a warrant "when it contains deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir. 1985) amended, 769 F.2d 1410 (9th Cir. 1985). To be entitled to an evidentiary hearing on the matter, "the defendant [must] make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Id.* at 781. As is the case with

affirmative information, a misleading omission must be done deliberately or recklessly. *Id.* The omitted facts must also be material to the finding of probable cause—that is to say, the omitted facts, when included in the affidavit, must "cast doubt on the existence of probable cause." *United States v. Johns*, 948 F.2d 599, 606–7 (9th Cir. 1991) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)).

The affidavit need not be an exhaustive account of all information related to the case. Rather, the affiant "need only show facts adequate to support a finding of probable cause." *Id.* at 606. The Supreme Court has held that affidavits in support of a warrant "must be tested in a commonsense and realistic fashion," and need only include "sufficient underlying circumstances to enable a judge to perform his detached function and not serve as a mere rubber stamp." *United States v. Ventresca*, 380 U.S. 102, 108-109 (1965). "Probable cause . . . is not a high bar[.]" *Kaley v. United States*, 571 U.S. 320, 338 (2014). Whether probable cause existed to issue the warrant is examined under the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213 (1983). To find probable cause, the magistrate judge need only find that there is a "fair probability" that the search will reveal "evidence of a crime." *Gates*, 462 U.S. at 238. "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

The inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police…" *Nix v. Williams*, 467 U.S. 431, 447 (1984). If, "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence must not be suppressed despite any

constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). The government must make this showing by a mere preponderance of the evidence. *Nix*, 467 U.S. at 444.

### ii. Whether the license plate reader is a search under the Fourth Amendment that requires a warrant

Rosales-Villegas does not dispute that LVMPD officers had a basis to stop the car he was driving, instead he argues that the LVMPD should not have known where the car was located. There is no direct case law on this issue: Rosales-Villegas instead asks this court to rule that law enforcement's use of license plate readers without a warrant, in general, is unconstitutional. Rosales-Villegas argues that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), should be interpreted to mean that law enforcement should be required to obtain a search warrant to access location data associated with license plate location databases generally. In *Carpenter*, the Supreme Court held that law enforcement was required to obtain a warrant prior to accessing cell phone location information obtained and maintained by private cell phone carriers based on the data's ability to document a person's physical location and movements continually and precisely.

The facts and conclusions in *Carpenter* are nothing like this case. In *Carpenter*, the location data concerned "12,898 location points cataloging Carpenter's movements [over a 127-day period] - an average of 101 points per day." *Id.* at 2212. While Rosales-Villegas is correct that the Court held in *Carpenter* that "... society's expectation has been that law enforcement agents and others would not - and indeed, in the main, simply could not - secretly monitor and catalogue every single movement of an individual's car for a very long period," *id.* at 2217, the LPR system at issue here did not do that and is incapable of doing that. As Rosales-Villegas's motion notes, in stark contrast to the 101 data points per day, the location of the car from the shooting was identified only a handful of times over a two-week period. Even when the car was located in Las Vegas on July 15, officers still could not find it to

effectuate an investigatory stop, emphasizing that, unlike cell location data that can permit real-time tracking of a person's location, LPR hits are a snapshot of a car's position for a moment in time.

Carpenter also cited *United States v. Knotts*, 460 U.S. 276 (1983), wherein the Court held that the police's use of a beeper to track the movements of a vehicle did not constitute a search because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements" from one place to another. Because the movements of the vehicle were "voluntarily conveyed to anyone who wanted to look," the vehicle's driver had no privacy interest in the information obtained by tracking the vehicle. *Id.* at 281. The Supreme Court's concern about unfettered and constant surveillance also formed the backdrop for its decision in *Jones*. In *Jones*, the Court held that where law enforcement physically installed a GPS tracking device on a citizen's vehicle without first obtaining a warrant, and remotely monitored every movement of the vehicle for a period of 28 days, the government violated the Fourth Amendment and unconstitutionally invaded the vehicle owner's reasonable expectation of privacy.

While "GPS monitoring generates a precise, comprehensive record of a person's public movements," *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring), the LPR system in the instant case did no such thing. The Supreme Court based the *Jones* decision on the government's physical trespass of the vehicle by installing the tracking device on it. *Jones* is inapplicable here for much the same reason that *Carpenter* is inapposite - there was no 24-hour constant surveillance in the instant case, and the resulting data was by no means precise enough to trigger the Supreme Court's privacy concerns.

While the location of a person's cell phone can generally be tracked only by a cell phone carrier, a vehicle's license plate can be (and is) tracked under myriad circumstances - e.g., when an illegally parked vehicle receives a parking citation and the parking enforcement officer uploads the date, time, and location of the parking infraction; or when a driver receives a speeding citation and the citing officer

11

notes the license plate number of the vehicle the location of the infraction. A license plate cannot be read or photographed by an LPR system while protected from public view, e.g., parked inside of a closed garage or backed up against a wall facing away from the street. A cell phone, however, can be (and is) tracked even when protected from public view - whether it is concealed inside of a pocket or purse, inside of a vehicle, or inside of a residence. These systems do no more than what a human being could do with a pen and paper and the requisite amount of time, such as when a guard at the entrance to a gated housing community records the license plate of a vehicle before granting entry to a non-resident. The reasoning in *Carpenter* is distinguishable from this case and there is no basis to apply it to license plate reading technology.

### iii.   Whether there was an unconstitutional arrest

Defendant argues that his arrest was a seizure from the start. From the moment defendant's vehicle was stopped, he was held at gun point while the police issued commands and ordered him to exit his vehicle with his hands behind his head. Defendant argues that these actions amounted to an arrest without probable cause. Officers handcuffed the defendant and placed him in the back of a patrol car. Defendant argues that these additional actions again amounted to an arrest without probable cause.

The LVMPD officers had reasonable suspicion to stop the car involved in the shooting because that the same car, with the same license plate, was involved in an "assault with a deadly weapon," "the subjects are supposed to be armed," and "the firearm involved is a 9 mm, semi auto." Based on the nature of the offense being investigated – a violent assault with a deadly weapon involving a firearm – and the advisement that "the subjects are supposed to be armed." The defendant was the driver of the car and the only person in the car. The tactics the police used here did not raise the investigatory nature of the stop to an arrest. Given the immediate danger, based on these facts, I find that the LVMPD officers used permissible tactics for clearing the car—such as drawing their guns, using a megaphone to

command the driver to exit the vehicle, handcuffing the driver, and placing him in a patrol car.

Given the circumstances of the drive-by shooting, LVMPD conducted a justifiable protective sweep that was cursory and did not involve entry into the vehicle. During the protective sweep, LVMPD officers saw, with the windows down, unspent 9mm rounds in the back of the car, the same caliber they were advised were used during the drive-by shooting in Los Angeles. The plain view exception is a well-established exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). At this point, LVMPD had probable cause that the stopped car contained evidence of the shooting and could have searched it even without a warrant pursuant to the automobile exception. "The automobile exception [to the warrant requirement] permits police to search a vehicle as long as the vehicle is 'readily mobile' and 'probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curium)). Probable cause is present when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

LVMPD had developed probable cause to search the vehicle once Officer Hansen saw 9mm rounds in the back of the car. Whether or not Rosales-Villegas was involved in the shooting in Los Angeles, or a suspect, is irrelevant. What mattered is that officers knew that (1) this car was involved in drive-by shooting in Los Angeles two weeks earlier, (2) that the shooting involved a 9mm, and (3) that there were 9mm unspent cartridges in the car. The remaining portion of the stop was focused on identifying the driver—an effort thwarted by Rosales-Villegas himself.

What matters is what LVMPD knew at the time of the stop and what was relayed to them to support reasonable suspicion or probable cause. What was relayed to the officers regarding the hit from the License Plate Reader was simply: "…It looks like it's a felony vehicle out of LA. Assault with a deadly weapon. It looks like the firearm involved is a 9 mm, semi auto." And "It's going to be a 2021

gray Toyota Highlander." As indicated by the body cameras, it was only after the driver was removed and 9mm rounds were discovered during the protective sweep that LVMPD reached out to the Los Angeles County Sheriff's Department for further information. The defendant also argues that the 2021 Toyota Highlander is black, not gray, so he states that the vehicle is not a match. Whether the car was gray or black is immaterial—certainly much less material than the actual license plate number and the fact that the exact make and model of the vehicle is an exact match.

When the LVMPD attempted to identify Rosales-Villegas, he repeatedly claimed he was "Felipe Rodriguez" and lied to officers about his identity. The government that the LVMPD had probable cause to arrest Rosales-Villegas for his false statements to police under N.R.S. 197.190 (Obstruction) and NRS Section 205.463.2 (Using the personal identifying information to avoid or delay being prosecuted for an unlawful act).It is undisputed that the defendant gave the police a fake identity, but the defendant argues (1) that police did not know that he gave them a fake identity until after his arrest, but rather that they only had a hunch, and (2) that providing a false identity to the police is not illegal (and that if the Nevada statute the government cites to does apply, it is unconstitutional). I do not reach these issues, however, because even if officers improperly arrested Rosales-Villegas, evidence obtained from the vehicle should not be suppressed because, as I analyzed above, the automobile exception justified LVMPD's search of the vehicle for evidence of the drive-by shooting.

### iv.  Whether the telephonic search warrant for the vehicle and Rosales-Villegas's DNA was valid

LVMPD Detective Davies obtained a search warrant for evidence related to "Assault with a Deadly Weapon" and "Prohibited Person Possession of Firearm." Rosales-Villegas alleges that (1) Detective Davies affirmatively misrepresented that the 2021 Toyota Highlander was gray (as listed in the NCIC hit) instead of black (as listed in the LA County Sheriff's report), and that (2) Detective

14

Davies failed to inform the court that there were multiple rounds, but there was only one gunshot (again, a fact that only comes from the investigative reports not seen by the LVMPD officers); and (3) that Los Angeles County Sheriff's had developed a potential suspect with a face tattoo.

Rosales-Villegas has not made a substantial preliminary showing that he is entitled to a *Franks* hearing. Rosales-Villegas has failed to show how the affidavit, if supplemented by the language Rosales-Villegas asserts should have been included, would not be sufficient to support a finding of probable cause. See *Stanert*, 762 F.2d at 782. To mandate a *Franks* hearing, the misstatements and omissions must be material to the finding of probable cause. Rosales-Villegas argues that if the reviewing judge knew the car was black instead of gray, there was one gunshot instead of multiple gunshots, and that Rosales-Villegas had "no apparent connection" to the families the victim "believed" were involved in the shooting, that it would have made a difference on those material facts.

Detective Davies' affirmative representation that the car involved in the shooting was identified as a 2021 Toyota Highlander with the license plate submitted to the Judge was true. The NCIC hit was recorded as a "Gray" Toyota Highlander. As I noted earlier, whether the car was gray or black is immaterial given that the make of the car and the actual license plate number matched. Even if the affidavit were altered as Rosales-Villegas suggests, the affidavit would still be sufficient to support a finding of probable cause, as it would still include all of the following facts: (1) that the license plate was from Nevada; (2) that the license plate number was RRSR0; (3) that it was a Raiders personalized Nevada license plate; (4) that it was a 2021 Toyota Highlander; (5) that after the vehicle was cleared at the Wynn Casino & Hotel, that officers observed numerous loose firearm ammunition scattered throughout the vehicle; (6) that according to Los Angeles County Sheriff's Department Det. Countryman, that victim Sandra Silvia reported that license plate and car as the same one that shot at her, (7) that Rosales-Villegas was a convicted felon; (8) that ex-felons cannot legally purchase or sell

firearms and they often tend to keep these items for long periods of time; (9) that ex-felons keep these items on or close to their persons in their residence or vehicles to prevent inadvertent discovery. This car was involved in a drive-by shooting, it was found less than two weeks later with ammunition visible in plain view, so law enforcement has probable cause to search that car, regardless of whether the current driver is a suspect of the shooting or not. When a prohibited person with a drug trafficking conviction drives a car containing ammunition visible in plain view, law enforcement has probable cause to both obtain his DNA and search the car he was driving. Re-writing the affidavit to include the facts Rosales-Villegas says were omitted does not defeat probable cause.

Rosales-Villegas has not provided a detailed offer of proof or affidavits indicating that any of the information that Detective Davies included in his affidavit was false. The defendant asserts that the Los Angeles County Sheriff's Department had another suspect, but Rosales-Villegas is directly linked to the registered owner of the vehicle—Yvonne Sintita Mejia. Rosales-Villegas has not shown how the purported statements or omissions were deliberately or recklessly made, given that the primary method of communication with the LA County Sheriff's Office by Officer Luoto and Detective Davies was by telephone. There is no need to hold a Franks hearing in this case with these facts. Even if the warrant were invalid, evidence seized from the vehicle would have been inevitably discovered. Since the car was stopped in the Wynn Casino & Hotel valet with no driver, the officers would have lawfully exercised their discretion to impound and tow the vehicle; the perfunctory inventory search would have inevitably resulted in the discovery of the firearm at issue.

### b. The defendant's motion to dismiss and the government's motion for leave to file excess pages

Rosales-Villegas filed a motion to dismiss counts two and three, arguing that the statutes are unconstitutional. ECF 57. After the government filed its response, Chief Judge Miranda Du issued an

order addressing similar issues. *United States v. Manuel Salvador Gil-Solano*, 3:23-cr-00018-MMD-CLB. The government filed the case as supplemental authority, and the defendant filed a thirteen-page response, which I have reviewed and considered, so I grant the government's motion for leave to file excess pages. ECF No. 72. Unlike the defendant in this case who is charged with violating both § 922(g)(1) and (g)(5)(A), the defendant in *Gil-Solano* was only charged with violating § 922(g)(5)(A). Another judge in this district, Magistrate Judge Daniel J. Albregts, wrote an opinion on whether § 922(g)(1) is constitutional pursuant to *Bruen,* which the government cited in their response brief. See *United States v. Martinez*, 2:21-cr-00219-APG-DJA. Although neither *Gil-Solano* or *Martinez* are binding precedent, I find both opinions persuasive because they specifically lay out clear rationales on the constitutionality of 18 U.S.C. § 922(g)(5)(A) and 922(g)(1). Since I find both opinions persuasive, I adopt their rationale. For brevity, I will not repeat Judge Du and Judge Albregts's entire analysis, but I incorporate their analysis by reference.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court in *Bruen* recently issued a new test for determining whether firearms regulations violate the Second Amendment. *See* 142 S. Ct. at 2126. Courts must first determine the threshold matter of whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct." *Id.* But a regulation may still be upheld if the government can demonstrate that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.*

> i.  **Whether § 922(g)(5)(A)(the illegal alien in possession statute) is constitutional**

Judge Du's order denied Gil-Solano's motion to dismiss on the grounds that "tradition of imposing oath-based restrictions on the possession of firearms is relevantly similar to § 922(g)(5)(A), such that it is consistent with the Second Amendment," and upheld 18 U.S.C. § 922(g)(5)(A) as

constitutional.

Regarding the plain text of the Second Amendment, "[t]he Supreme Court has not yet explicitly delimited the scope of 'the people' whom the Second Amendment protects." See *United States v. Manuel Salvador Gil-Solano*, 3:23-cr-00018-MMD-CLB (citing cases and noting that *Bruen* left undefined 'the people' to whom Second Amendment rights extend). Judge Du also noted that four circuit courts – including the Ninth Circuit in *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019) – have assumed, without deciding, that 'the people' includes undocumented immigrants. See *Gil-Solano* at 5 (citing cases). Given the large and complicated questions in this field, the ambiguity of controlling precedent, and the canon of constitutional avoidance, I agree with Judge Du, and I, "follow the Ninth Circuit's lead and assume, without deciding, that unlawful aliens fall within the scope of the Second Amendment right as articulated under *Heller* and *Vergudo-Urquidez*, and now also *Bruen*." *Gil-Solano* at 5 (citing to *Torres*, 911 F.3d at 1261, internal citations omitted).

Regarding *Bruen's* historical tradition test, Judge Du considered whether § 922(g)(5)(A) is "consistent with this Nation's historical tradition of firearm regulation." See *Gil-Solano* at 5, citing to 142 S.Ct. at 2126. Judge Du, after a lengthy analysis, found that the colonial tradition of imposing oath-based restrictions on the possession of firearms is relevantly similar to §922(g)(5)(A), such that it is consistent with the Second Amendment. See *Gil-Solano* at 7 (citing multiple colonial laws adopted near in time to the Second Amendment's adoption in 1791 that prohibited firearms ownership for those who did not swear an oath of allegiance to the state.) I agree with Judge Du that "§ 922(g)(5)(A) is 'consistent with this Nation's historical tradition of firearm regulation.'" *Gil-Solano* at 9, citing to Bruen, 142 S.Ct. at 2135.

### ii.  Whether §922(g)(1) (the felon in possession statute) is constitutional

Judge Albregts analyzed whether 18 U.S.C. § 922(g)(1) is unconstitutional post-*Bruen*. *United*

*States v. Martinez*, 2:21-cr-00219-APG-DJA. Rosales-Villegas argues that *Bruen* renders pre-*Bruen* precedent, such as *Heller, McDonald*, and other Ninth Circuit precedent regarding the constitutionality of Section 922(g)(1), nonbinding. I find Judge Albregts's findings on this issue persuasive, as he laid out a detailed analysis illustrating that pre-*Bruen* precedent applies without running afoul of *Bruen*. Judge Albregts noted that the majority in *Bruen* specifically stated that its holding is 'in keeping with *Heller*.' See *Martinez*, citing to *Bruen*, 142 S. Ct. at 2126. Judge Albregts also included multiple quotes from the Supreme Court justices noting that *Bruen* did not disturb prior president. *Id.* Judge Albregts also found that the Ninth Circuit's decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) upholding the constitutionality of Section 922(g)(1), remains good law.

Rosales-Villegas argues that *Vongxay* rejected "the means-end scrutiny, "but the decision itself demonstrates that the Ninth Circuit merely cited to a line of pre-*Heller* Fifth Circuit case law as "lend[ing] credence to the post-*Heller* viability" of prior precedent upholding the constitutionality of Section 922(g)(1). 594 F.3d at 1116-17. I adopt Judge Albregts's analysis that *Bruen* does not render *Vongxay* nonbinding. The overwhelming majority of federal courts have upheld the constitutionality of § 922(g)(1) under *Bruen*. See *United States v. Martinez*, 2:21-cr-00219-APG-DJA (n. 1, citing cases). In keeping with these decisions, I now find that the prohibition on the possession of firearms by felons found in Section 922(g)(1) does not violate the Second Amendment.

The defendant also argues that 922(g)(1) in unconstitutional as applied to him because the government cannot show he is sufficiently dangerous to warrant disarmament. ECF No. 57 at 7. His prior felony conviction is for a non-violent drug offense (conspiracy to distribute cocaine). ECF No. 46 at 2-3. He also argues that although the investigation in this case started with a drive-by shooting in Los Angeles, there's no evidence he was actually involved in that shooting. ECF No. 57 at 7. The government notes that colonial-era laws disarmed those who defamed acts of Congress, failed to swear

allegiance to the state, or refused to defend the colonies. *Folajtar v. AG of the United States*, 980 F.3d at 908 & n.11 (reviewing colonial laws from Connecticut, Pennsylvania, and Massachusetts). "[A]t their ratification conventions, several states proposed amendments limiting the right to bear arms to both law abiding and 'peaceable' citizens." *Id.* at 908 (reviewing proposed amendments in Pennsylvania, New Hampshire, and Massachusetts). Even if some of the laws at the Founding were concerned about dangerousness, "dangerousness was one reason to restrict firearm possession, but it was hardly the only one." *Id.* at 909. *Bruen* reaffirmed *Heller*, as there have existed in this country "longstanding prohibitions on the possession of firearms by felons." 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring). *Heller's* point in endorsing felon-in-possession laws was not that they had existed in their modern form since the nation's founding, but that they were analogous enough to historical regulations to be deemed "longstanding." See 544 U.S. at 626–27. Well-established and representative historical analogues to Section 922(g) have existed throughout the nation's history. I find that Section 922(g)(1)'s prohibition on felons bearing arms is firmly rooted in this nation's history.

ACCORDINGLY,

I RECOMMEND that Rosales-Villegas's motion to suppress (ECF No. 55) be DENIED.

I FURTHER RECOMMEND that Rosales-Villegas's motion to dismiss (ECF No. 57) be DENIED.

I FURTHER ORDER that the government's motion for leave to file excess pages (ECF No. 72) is GRANTED.

I FURTHER ORDER that the evidentiary hearing (ECF No. 79) is VACATED.

DATED this 5th day of January 2024.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE